**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Christopher J. Toomey, a United States Federal Bureau of Investigation Task Force Officer, being first duly sworn, hereby depose and state as follows:

## I.      PURPOSE OF AFFIDAVIT

1.      I submit this affidavit in support of an application for a warrant to search the following premises:

> Motel 6, room 332, located at 77 Spit Brook Road, in Nashua, New Hampshire (hereafter, the "**TARGET MOTEL ROOM**").

2.       Based on the information contained herein, there is probable cause to believe that the **TARGET MOTEL ROOM**, described in Attachment A, contains evidence, fruits, and instrumentalities as further described in Attachment B of the crimes of 21 U.S.C. §§ 841 and (b)(1)C) [Unlawful distribution of controlled substances, specifically, methamphetamine, a Schedule II controlled substance] (hereafter "**Target Offenses**").

3.      The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, and information received from other law enforcement officers. I have not set forth every detail I or other law enforcement officers know about this investigation but have set forth facts that I believe are sufficient to evaluate probable cause as it relates to the issuance of the requested warrant.

## II.      AGENT BACKGROUND

4.      I am a Task Force Officer ("TFO") with the United States Federal Bureau of Investigation ("FBI") having served in this capacity since October of 2020. From 2010 to 2020, I served as a law enforcement officer with the Nashua Police Department, Nashua, New Hampshire. Since 2019, I have been assigned to the Nashua Police Departments Narcotics Intelligence Division.

5.      In my law enforcement training and experience, I have had an opportunity to search for, seize, and personally observe what I have recognized to be and what was later confirmed by drug analysis to be scheduled drugs, including but not limited to heroin, fentanyl, methamphetamine, cocaine, marijuana (both dried and growing), crack cocaine, and various narcotics lawfully available only by prescription.  I have conducted or participated in among other things, surveillance, undercover transactions, debriefings of informants and confidential human sources, and reviews of taped conversations relating to narcotics trafficking.  I have assisted in many other investigations, both state and federal. I have drafted drug related search and arrest warrants and have assisted in the execution of numerous search and arrest warrants in which controlled substances, drug paraphernalia, drug related electronic data, and other contraband were found. Through my training and experience, I have become familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs.

6.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

7.      The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, information received from other law enforcement officers, including their direct examination of relevant documents, and physical surveillance conducted in connection with persons and places mentioned in this affidavit. The purpose of this affidavit is limited to showing that probable cause exists to support the issuance

of an arrest warrant and criminal complaint.  Accordingly, while this affidavit contains all the material information, I am aware of that is pertinent to the requested arrest warrant and complaint, it does not include each and every fact known by me or other investigators concerning the investigation.

## III.   STATUTORY AUTHORITY

8.     This investigation relates to offenses committed in the District of New Hampshire, to wit: the unlawful distribution of controlled substances, specifically, methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  21 U.S.C. § 841(a)(1) makes it a crime for any person "knowingly or intentionally to … distribute . . . or possess a controlled substance with the intent to distribute." . . . defined in [Title 21]."

## IV.   PROBABLE CAUSE

9.     Based on my training and experience, and the facts set forth in this affidavit, I have probable cause to believe Philip "PJ" Wetmore ("WETMORE") has unlawfully distributed Schedule II controlled substances, namely: methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

10.     Since September of 2021, an FBI confidential human source ("CHS") has been cooperating with the FBI in exchange for considerations on criminal charges. CHS has various convictions for Felon in Possession of Dangerous Weapon, Criminal Threatening with Deadly Weapon, Criminal Mischief, Possession of a Weapon While Committing a Violent Crime, Violation of Parole/Probation, Theft, Shoplifting, Criminal Threatening, Robbery, Stalking, Simple Assault, Conduct After Accident, Driving Under the Influence, Domestic Violence, and Controlled Drug Act violations.

11.     In February 2022, while under direct supervision of FBI Agents and during the

course of a controlled drug transaction, the CHS was observed on an audio/video recording smoking an unknown substance from a water filtration-smoking device.  When confronted by FBI Agents about this observation seen on the audio/recording device, the CHS explained that WETMORE and the CHS were smoking marijuana from the water filtration-smoking device and that the CHS believed that he/she was lawfully permitted to due to so because the CHS has a State of New Hampshire medical marijuana prescription.  This unlawful activity was reported to and adjudicated via FBI policy and procedure.  Since the CHS has begun cooperating, FBI Agents believe that the information the CHS has provided has been truthful and reliable, as CHS's information has been corroborated by audio and video recordings, surveillance, and information obtained from public records, and other sources.

12.     On February 1st and February 2nd, 2022, the FBI formulated plans to have the CHS purchase one ounce (approximately 28 grams) of methamphetamine from WETMORE on February 2, 2022 at WETMORE's residence which was identified as 80 Chandler Street, 1st Floor Apartment in Nashua, New Hampshire and in doing so, the CHS contacted WETMORE via text message and the two arranged for the purchase of the ounce of methamphetamine for $600 of U.S. Currency.[1] It should be noted the CHS contacted WETMORE via text at both 978-914-2174 and 978-930-8130 in order to negotiate the controlled drug transaction.  Both numbers are known to the investigation to be used by WETMORE.

13.     On February 2, 2022, at approximately 12:26 p.m. FBI Agents made contact with the CHS and transported the CHS to a pre-arranged meeting location and searched CHS's person for contraband, weapons, and currency, with negative results. In the presence of FBI agents, the CHS was directed to contact WETMORE via a phone call in order to confirm the location of the pre-negotiated drug transaction.

---

[1] The FBI retained screen shots of the text message communications between the CHS and WETMORE.

14.     WETMORE advised the CHS to respond to 80 Chandler Street, 1st Floor Apartment.  FBI agents provided the CHS with $600 in serialized currency and equipped the CHS with an audio/video recording device that FBI agents activated prior to the CHS leaving the pre-arranged location.

15.     At approximately 1:28 p.m., the CHS left the presence of FBI Agents handling the CHS and responded to directly to WETMORE's residence via foot.  At approximately 1:31 p.m., the CHS entered WETMORE's residence. At approximately 1:43 p.m., the CHS exited WETMORE's residence and proceeded to respond directly back to the FBI Agents handling the CHS at the pre-arranged location.  The CHS was under constant and unbroken surveillance for the duration of this controlled drug transaction.  The only time the CHS was not under surveillance was when the CHS was inside of WETMORE's residence.

16.     The CHS provided the FBI Agents handling the CHS the audio/video recording device, and one glassine baggie containing a crystal-like substance believed to be methamphetamine which the FBI agents later field-tested utilizing a TruNarc laser-testing device and received a presumptive positive result for methamphetamine and weighed approximately 30.2 grams (with packaging materials).  FBI agents searched the CHS for contraband, weapons, and unexplained currency with negative results.  The item believed to be methamphetamine will be sent to the Drug Enforcement Administration ("DEA") lab for further testing.

17.     The CHS stated that upon the CHS arriving at WETMORE's residence, the CHS was met by WETMORE who had opened the entrance door allowing the CHS to enter.  The CHS provided a description of the entrance to WETMORE's residence which was confirmed and positively identified by FBI Agents as the only entrance on the south side of 80 Chandler Street. The CHS positively identified WETMORE as the male subject who opened the entrance door

allowing the CHS to enter.[2]

18.     The CHS stated that upon entering WETMORE's residence, the CHS determined that WETMORE was the only occupant within the residence.  The CHS described the interior of the residence as a small studio apartment.  The CHS stated there is an interior door which leads to a common basement, and second interior door which leads to a common hallway.  The CHS added during his/her contact with WETMORE, he/she never left the small studio apartment.

19.     During the CHS' contact with WETMORE, the CHS stated WETMORE provided the CHS with a glassine baggie containing the suspected crystal-like substance believed to be methamphetamine, and in return, the CHS provided WETMORE with the $600 in serialized currency. The CHS further advised FBI agents that the CHS observed WETMORE to be in possession of at least four more glassine baggies that contained a similar crystal-like substance that the CHS believed to be methamphetamine.  The CHS stated the other four baggies were similar in size to the baggie the CHS had purchased from WETMORE.  The CHS further stated that the CHS observed a grip of a pistol in the rear waistband of WETMORE's pants.

20.     FBI Agents subsequently reviewed the audio/video recording of the narcotics transaction in its entirety and confirmed that the recordings, statements made by the CHS, and the observations made by members of surveillance team were consistent and accurate with one another.  FBI Agents were also able to positively identify the male subject who completed the controlled drug transaction with the CHS as WETMORE from previously reviewing law enforcement booking photographs of WETMORE as well as reviewing social media images of WETMORE which were provided by the CHS.

---

[2] Prior to this operation, the CHS provided social media images of WETMORE to FBI Agents identifying WETMORE as the individual the CHS was going to purchase methamphetamine from.  FBI Agents were able to confirm that the social media images the CHS provided of WETMORE were in fact WETMORE by comparing them to previous law enforcement booking photographs of WETMORE.

21.     As noted earlier, when reviewing the audio/video recordings, FBI Agents also observed both the CHS and WETMORE smoking an unknown substance from what appeared to be a glass/water filtration-smoking device.  When confronted by FBI Agents about this observation seen on the audio/recording device, the CHS explained WETMORE and the CHS were smoking marijuana and that the CHS believed it was okay due to the fact the CHS has a State of New Hampshire medical marijuana prescription.  Prior to this operation, the CHS was admonished and instructed not to use controlled substances on FBI operations.

22.     On February 9th and 10th, 2022, the FBI formulated plans to have the CHS purchase two ounces (approximately 56 grams) of methamphetamine from WETMORE on February 10, 2022, at a location to be determined later in Nashua, New Hampshire.  Acting at the direction of the FBI, the CHS contacted WETMORE via text messages and telephone calls to arrange for the purchase of the two ounces of methamphetamine.  During these communications, WETMORE texted the CHS that he was staying at Motel 6, room 332.  The CHS further explained that he/she believed WETMORE was staying at a "Motel 6, 332." The CHS had previously informed me the CHS had previously been with WETMORE at the Motel 6 at Exit 5 in Nashua, New Hampshire. I know as a Nashua, New Hampshire police officer that there is a Motel 6 located off of Exit 5 in Nashua. It should be noted the CHS contacted WETMORE via text at both 978-914-2174 and 978-930-8130 to negotiate the controlled drug transaction.  Both numbers are known to law enforcement agents to be used by WETMORE.

23.     On February 10, 2022, at approximately 10:48 a.m., FBI agents met the CHS at a pre-arranged meeting location.  It should be noted the CHS was in his/her personal vehicle during the duration of this operation.  At the direction of, and in the presence of FBI agents, the CHS placed a recorded phone call into WETMORE at 978-930-8130 to continue the arrangement of the controlled drug transaction.  During the phone call, FBI agents overheard

heard a male voice answer the phone call who I recognized as WETMORE.  WETMORE
directed the CHS to meet him at the Burlington Coat Factory, located at 51 Gusabel Avenue, in
Nashua, New Hampshire.

24.     At approximately 11:30 a.m., the CHS, still under constant and unbroken FBI
surveillance, responded to a secondary pre-arranged meeting location.  At approximately 11:31
a.m., FBI agents searched CHS's person for contraband, weapons, and currency, with negative
results.

25.     FBI agents provided the CHS with $1020.00 in serialized currency and equipped
the CHS with an audio/video recording device that FBI agents activated prior to the CHS leaving
the pre-arranged location.

26.     At approximately 11:49 a.m., the CHS left the presence of FBI agents handling
the CHS and responded to directly to the area of front entrance of the Burlington Coat Factory in
the CHS's vehicle and under FBI surveillance.  At approximately 11:51 a.m., a member of the
Nashua Police Department's Narcotics Intelligence Division observed a male matching the
description of WETMORE exit from his residence door at 80 Chandler Street and enter the
driver's seat of a black Nissan ("black Nissan") bearing a Massachusetts registration 2AEW38.

27.     At approximately 12:00 p.m., FBI agents, and members of the Nashua Police
Department's  Narcotics Intelligence Division observed the black Nissan pull into and park in the
parking lot of the Burlington Coat Factory where FBI Agents were able to positively identify the
operator, and single occupant of the black Nissan , as WETMORE.

28.     At approximately 12:02 p.m., WETMORE exited the black Nissan with a
backpack on his back, approached the CHS's vehicle, and advised the CHS accompany him into
the Burlington Coat Factory.  At approximately 12:02 p.m., the CHS and WETMORE entered
the main entrance of Burlington Coat Factory.  At approximately 12:07 p.m., the CHS exited the

same entrance of the Burlington Coat Factory and responded directly back to the CHS' vehicle. The CHS was under constant and unbroken FBI surveillance for the duration of this controlled drug transaction. The only time the CHS was not under FBI surveillance was when the CHS was inside of the Burlington Coat Factory for approximately five minutes.

29.     The CHS provided the FBI agents handling the CHS the audio/video recording device, and one glassine baggie containing a crystal-like substance believed to be methamphetamine, which the FBI agents later field-tested utilizing a TruNarc laser-testing device and received a presumptive positive result for methamphetamine that weighed approximately 56.81 grams (with packaging materials). FBI agents searched the CHS for contraband, weapons, and unexplained currency with negative results. The FBI will send the suspected methamphetamine to the DEA laboratory for further testing.

30.     The CHS stated that upon arriving at to the Burlington Coat Factory, the CHS was met by WETMORE who had approached the CHS's vehicle on foot. Upon making contact with WETMORE, the CHS stated that WETMORE displayed a glassine baggie containing a crystal-like substance believed to be methamphetamine to the CHS. The CHS instructed WETMORE to drop the suspected methamphetamine inside of the CHS's vehicle which the CHS secured in the glove box of the CHS's vehicle.

31.     WETMORE then asked the CHS to enter the Burlington Coat Factory in order to complete the controlled drug transaction. The two then entered the Burlington Coat Factory together and walked between two clothes aisles in the men's section. The CHS put the $1,020.00 of serialized U.S. Currency in a pair of gray jeans and handed the jeans to WETMORE. WETMORE explained to the CHS that he was currently in possession of a pistol that WETMORE said he had removed the serial number with a dremel tool. WETMORE also said that he was willing to sell the pistol to the CHS for $700.

32.     WETMORE also told the CHS that he was in possession of "two pounds of dope" and a "kilo of ice."  I know that "dope" is a common slang/street term for heroin and or fentanyl and  "ice" is a common slang/street term for methamphetamine.

33.     The CHS positively identified WETMORE as the male subject who sold him/her the methamphetamine and advised the FBI agents that he/she did not make contact with anyone else other than WETMORE.

34.     Prior to this operation, the CHS provided social media images of WETMORE to FBI agents identifying WETMORE as the individual the CHS was going to purchase methamphetamine from.  FBI agents were able to confirm that these social media images of WETMORE were in fact WETMORE by comparing them to previous law enforcement booking photographs of WETMORE.

35.     FBI agents subsequently reviewed the audio/video recording of the narcotics transaction in its entirety and confirmed that the recordings, statements made by the CHS, and the observations made by members of surveillance team were consistent and accurate with one another.  FBI agents were also able to positively identify the male subject who completed the controlled drug transaction with the CHS as WETMORE from previously reviewing law enforcement booking photographs of WETMORE as well as reviewing social media images of WETMORE which were provided to the FBI by the CHS.

36.     As mentioned earlier in this affidavit, WETMORE was observed operating the black Nissan from his residence of 80 Chandler Street in Nashua, New Hampshire to the Burlington Coat Factory in Nashua, New Hampshire.  During this investigation, FBI agents determined that  WETMORE's New Hampshire operating privileges are suspended, and WETMORE was also required to provide insurance while operating a motor vehicle.  It was also

discovered from reviewing WETMORE's criminal background that WETMORE is a convicted

felon and is prohibited by law from owning or possessing a firearm.

37.     At approximately 1:32 p.m., members of the Nashua Police Department placed

WETMORE under arrest as WETMORE exited the main entrance of the Burlington Coat

Factory.  WETMORE was found to be in possession of a loaded silver .357 magnum Smith and

Wesson revolver style pistol, with what appeared to be an obliterated serial number.

38.     Once WETMORE was placed under arrest, FBI Agents and members of the

Nashua Police Department responded to both Motel 6's located within Nashua, New Hampshire

to possibly locate which room "332" WETMORE had previously advised the CHS he was

staying at.

39.     Upon responding to the Motel 6 located at 77 Spit Brook Road in Nashua, New

Hampshire, FBI Agents discovered that a Kathleen Balboni (BALBONI"), date of birth,

December 27, 1975, was renting room 332 at the Motel 6, 77 Spit Brook Road, Nashua, New

Hampshire.  While conducting surveillance on February 8, 2022, of WETMORE's 80 Chandler

Street residence, FBI agents observed BALBONI's vehicle, a white GMC Acadia bearing New

Hampshire registration 445 8910, parked directly in front of WETMORE's residence. Having

reason to believe BALBONI was an associate of WETMORE's, FBI Agents and members of the

Nashua Police Department responded to room 332 in order to possibly make contact with

BALBONI.

40.     Upon responding to the TARGET MOTEL ROOM, members of the Nashua

Police Department made contact with BALBONI.  Upon answering the door of the TARGET

RESIDENCE, BALBONI apologized for the delay as she was "covering up the paraphernalia on

the bed." Upon conducting a safety sweep for more persons within the TARGET MOTEL

ROOM, members of the Nashua Police Department observed While speaking with BALBONI,

11

who was the only occupant within the TARGET MOTEL ROOM, members of the Nashua

Police Department observed what they believed through their training and experience to be a

glass smoking device consistent with smoking narcotics.

41.     While speaking with BALBONI she informed FBI Agents and members of the

Nashua Police Department she had rented the room for her friend "PJ" and that everything in the

room was "PJ's".  Upon completion of speaking with BALBONI, BALBONI left the scene, and

FBI Agents remained at the TARGET MOTEL ROOM in lieu of a federal search warrant.

42.     Once WETMORE was placed in custody, FBI Agents approached WETMORE

and advised him of his state level charges.  FBI Agents asked WETMORE if he wished to be

called "PJ" or "Philip" to which WETMORE replied we could call him either name.

WETMORE was then transported to the Nashua Police Booking are where WETMORE was

booked as per department SOP and secured in cell adult male 2.

43.     Upon completion of the booking process, FBI Agents approached WETMORE

and asked him if he wished to speak with FBI Agents in regards to his charges.  WETMORE

agreed and agents escorted WETMORE from his cell to an interview room located in the rear of

the booking area.  During the post arrest interview, WETMORE acknowledged that his

nickname is "PJ".

<u>Training and Experience Concerning Items to be Seized</u>

44.     Based upon my training and experience, as well as the collective knowledge and

experience of other agents and police officers in my office, I am aware that drug traffickers very

often store controlled substances, firearms, and other tools of the drug trade in their homes,

automobiles, garages or outbuildings on their properties, basements, motel rooms, or other places

under their immediate control.  I am aware that it is generally a common practice for drug

traffickers to store their drug inventory and drug-related paraphernalia including, but not limited

to, scales, plastic baggies, wrapping material, paper or plastic bundles, and zip lock bags, in

residences, motel rooms or other locations they access with frequency.  Based on my training

and experience, powder drugs such as fentanyl are generally brought into the region in bulk.

However, such drugs are not typically consumed by users in such high purity form.  Rather, such

powder drugs, when ultimately consumed by the user, are at a lower purity level.  High purity

powder drugs are reduced in purity by the addition of dilutants.  This process is called "cutting"

or "stepping on" the drug. Other equipment, such as scales, presses, grinders, razor blades, glass

panes, blenders, and mirrors, and the like are typically used in this cutting process. Once the drug

has been "cut," a usual practice is to repackage or "press" it in smaller quantities such as ten (10)

gram fingers or other types of plastic bags for redistribution.

45.     It is generally a common practice for drug traffickers to maintain in hard copy or

on other electronic devices, records relating to their drug trafficking activities. Because drug

traffickers in many instances will "front" (that is, sell on consignment) controlled substances to

their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such

record-keeping is necessary to keep track of amounts paid and owed, and such records will also

be maintained close at hand so as to readily ascertain current balances.

46.     Drug traffickers will commonly maintain records and documents which provide a

paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual

transactions. There are many reasons why an individual will generally maintain records for long

periods of time. One reason is that the records will often seem innocuous because of their nature

(e.g. financial, credit card and banking documents, travel documents, receipts, client lists,

documents reflecting purchases of assets, personal calendars, telephone and address directories,

check books, videotapes and photographs, utility records, ownership records, letters and notes,

tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes,

packaging materials, computer hardware and software).  Second, the individual may no longer realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence.  Lastly, it is common for individuals to set aside or store such records, and because they generally have no immediate need for the records, they are often forgotten.  To law enforcement, however, all these items may have significance and relevance when considered in light of other evidence.

47.     Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  Drug traffickers may also keep lists of customers, the cars they drive, and the phones they use in order to keep track of them.  They may also collect court papers and other documents about customers who they believe may be cooperating with law enforcement authorities in order to protect themselves or attempt to intimidate potential cooperators.

48.     It is also a generally common practice for traffickers to conceal at their residences, motel rooms, or other places they access frequently, large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances.  Individuals who distribute controlled substances often use cash or readily transported assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature of the transactions and to lessen the possibility of a financial paper trail.  Additionally, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  They may also use banks and wire companies, both foreign or domestic, to launder and transfer funds to co-conspirators.  They may also use shipping companies and keep records of shipments of goods bought with drug proceeds. Records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.  I know that drug traffickers

sometimes purchase real estate with suspected drug proceeds.  They may keep records of real estate transactions, money received from rental properties, and other such documents in their residences and or motel rooms.

49.     Based on my training and experience, I know that individuals involved in the distribution of controlled substances attempt to hide the true identity of their residence, and or motel rooms, and, further, employ methods of surveillance at such residence in order to evade law enforcement.  Typically, these individuals will maintain at their residence and or motel rooms, documents relating to the identity of the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences and or motel rooms, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  I know that drug traffickers often use storage units to store drug proceeds, and motel rooms, and that keys or records of these units may be kept in residences and motel rooms.

50.     Often, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

51.     Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments.  I am aware that items such as cell phones and U.S. currency are often located in a residence, and motel rooms or on an individual's person.

52.     Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product

and such items are usually maintained within their residence, motel rooms, and sometimes on cell phones.

53.      It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

54.      I know that individuals who distribute narcotics often utilize motor vehicles in order to obtain quantities of controlled substances from their source of supply for distribution. I also know that individuals who are engaged in the distribution of controlled substances utilize motor vehicles in order to transport controlled substances to various locations in order to meet with and distribute controlled substances to potential drug purchasers.

<u>Training and Experience on Digital Devices</u>

55.      In addition to documentary evidence of financial and drug trafficking crimes, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at drug stash houses or at the dealers' own residences, or dealer's motel rooms.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  I am aware that collections of cell phones have been found during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

56.     As noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs.  Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from most cell phones.  I know, based on my training and experience, that drug traffickers may use encrypted chat platforms like Whatsapp, Textnow, Facebook Messenger, and Instagram, to communicate with people in other countries (often countries from where drugs are brought into the United States) and with people who are most cautious about law enforcement detection. Other applications like Venmo or Cashapp allow people to quickly make financial transfers to others and drug customers may use these methods to pay their sources of supply for drugs.

57.     In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones.  Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking.  Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking.  Such numbers can confirm identities of particular speakers and the occurrence of certain events. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers.  Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

58.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device.

Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

      a.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

      b.  Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

      59.    Based on my training and experience, some smartphones can be unlocked via the use of a fingerprint in lieu of a numeric or alphanumeric password. I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of devices such as iPhones and iPads, offer their users the

ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password.  This feature is called Touch ID.

60.     If a user enables Touch ID on a given device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device.  In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

61.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

62.     Although Apple's Touch ID may be the most common or well-known means for unlocking a device with a fingerprint, I am aware that other brands of smartphones like Samsung also offer a similar feature that works essentially the same way.  Therefore, when I refer to "Touch ID" I am not just referring to Apple devices, but to similar technology on all

smartphones.  While I believe that the targets of this investigation likely use smartphones, I am not aware of the particular brand of phone that they use.

63.     The passcodes that would unlock the targets' devices is not known to law enforcement. Thus, it may be necessary to press the fingers of the user of the device to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  Attempting to unlock devices with the use of the fingerprints of the user is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

64.     Based on the facts discussed in this affidavit I believe that WETMORE is the primary user of cellular telephone number 978-914-2174 and 978-930-8130, and thus his fingerprints are among those that are able to unlock the device via Touch ID.  We intend to call this numbers when searching the **TARGET MOTEL ROOM**. If the phones ring, and the user is present, I request authority to place his or her fingers on the Touch ID sensors to unlock the device.

## VI.     <u>CONCLUSION</u>

65.     For all the reasons described above, I submit that there is probable cause to believe that evidence and fruits of the violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (unlawful distribution of controlled substances) will be found by searching the premises described in Attachment A.  Based upon my training and experience I believe that the items set forth in Attachment B are commonly possessed by drug traffickers in their homes, on their cell phones, or in other places under their control to include motel rooms, and that those items are evidence of violations of the offenses being committed by WETMORE.

Respectfully submitted,


/s/ Christopher J. Toomey
Christopher J. Toomey, Task Force Officer
Federal Bureau of Investigation



        The affiant appeared before me by telephonic conference on this date pursuant to Fed. R.
Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.


Date: __Feb 10, 2022__

Time: __8:51 PM, Feb 10, 2022__

HONORABLE ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## <u>THE TARGET MOTEL ROOM</u>
**Motel 6, ROOM 332**
**77 Spit Brook Road**
**Nashua, New Hampshire**

The **TARGET MOTEL ROOM** is described as a 3rd Floor Motel Room on the East side of Motel 6 located at 77 Spit Brook Road, Nashua, New Hampshire and is further described as a small single motel room with two beds inside of it. with the blue motel door with the number "332" on it. Motel 6 is a motel with multiple motel rooms on several levels.  The entrance to the TARGET MOTEL ROOM is a blue door with the number "332" clearly depicted on the front of said door.







**ATTACHMENT B**
**Items to be Seized**

1.      Controlled substances including, but not limited to methamphetamine;

2.      Drug distribution paraphernalia including, but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, blenders, zip lock bags, presses, cutting agents, and pill presses;

3.      Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers believed to be used by WETMORE and electronic equipment used for counter-surveillance such as scanners, police radios or monitors;

4.      Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, and address books;

5.      Large amounts of currency (exceeding $500) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

6.      Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, automobiles, motorcycles, trucks, or other vehicles purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

7.      Photographs, negatives, video tapes, films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

8.      Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

9.      Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive devices, etc., in which there is no immediate appearance of legitimate use, and of which may be used in conjunction with the distribution of controlled substances;

10.     Indicia of possession of the place to be searched: including articles of personal property, such as personal identification, immigration documents, personal correspondence, delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts,

personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

11.    Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning WETMORE, business entities in which they are stakeholders, or co-conspirators; and

12.    Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

13.    For the cellular telephones assigned call number 978-914-2174 and 978-930-8130 which are used primarily by WETMORE, I seek to search the telephones for:

     a.    Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances;

     b.    lists of customers and related identifying information;

     c.    types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

     d.    any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

     e.    any information involving the travel to obtain controlled substances or the transportation of controlled substances;

     f.    information reflecting contact or communication with coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Snapchat, and Instagram stored on the phone);

     g.    all bank records, checks, credit card bills, account information, and other financial records (including on financial applications like CashApp and Venmo);

     h.    Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

During the execution of the search of the **TARGET MOTEL ROOM** described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of WETMORE, if found at the **TARGET MOTEL ROOM**, to the fingerprint sensor of the devices respectively believed to be used by him for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.